## Richmond

C. H. Lamb, Commissioner of the Division of Motor Vehicles of the Commonwealth of Virginia v. Pierce Barnes Taylor, Jr.

January 21, 1957.

Record No. 4598.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan, Miller and Whittle, JJ.

The opinion states the case.

*D. Gardiner Tyler, Jr., Assistant Attorney General (J. Lindsay Almond, Jr., Attorney General, on brief), for the appellant.*

*B. Drummond Ayres (R. Norman Mason, on brief), for the appellee.*

Miller, J., delivered the opinion of the court.

By order of October 25, 1955, entered under authority of § 46-420,

Code 1950, C. H. Lamb, Commissioner of Motor Vehicles, suspended for a period of ninety days the license and permit of Pierce Barnes Taylor, Jr., to operate a motor vehicle. The pertinent provisions of § 46-420 under which the suspension was ordered follow:

"The Commissioner may, after due hearing, * * * suspend or revoke for not more than one year * * * the operator's or chauffeur's license issued to any person * * * whenever it is satisfactorily proved * * * that the licensee under charges:

"(1) Has, by reckless or unlawful operation of a motor vehicle, caused or contributed to an accident resulting in death or injury to any other person or in serious property damage. * * *

"(5) Has committed a serious violation of the motor vehicle laws of this State * * * ."

The notice citing Taylor to appear before a hearing officer charged that

(1) On May 20, 1955, at 9:45 a.m. he did "by reckless or unlawful operation of a motor vehicle cause or contribute to an accident" at the intersection of State routes 702 and 693 in Accomack county, which resulted in the death of Emanuel Taylor, and

(2) The offense committed by him on May 20, 1955, was "a serious violation of the motor vehicle laws of this State" for which he was convicted on June 6, 1955, in the trial justice court of Accomack county and fined $25.00 and costs.

The Commissioner's order shows that he found Taylor's operation of his automobile justified suspension of his license and permit on both charges, which were based respectively upon paragraphs (1) and (5) of § 46-420.

Taylor invoked § 46-424, 1956 Cum. Supp., Code 1950, and appealed to the circuit court. The pertinent provisions of that section follow:

"(d) The court, sitting without a jury, shall hear the appeal on the record transmitted by the Commissioner and such additional evidence as may be necessary to resolve any controversy as to the correctness of the record, and the court shall receive such other evidence as the ends of justice require.

"(e) The court may affirm the decision of the Commissioner or remand the case for further proceedings; or it may reverse or modify the decision if the findings, conclusion, or decision of the Commissioner is (1) in violation of constitutional provisions or (2) in excess of statutory authority or jurisdiction of the Commissioner; or (3)

made upon unlawful procedure; or (4) affected by other error of law; or (5) unsupported by the evidence on the record considered as a whole; or (6) arbitrary, capricious, or an abuse of discretion; or (7) *if such other evidence is heard* may affirm, reverse or modify the decision as the ends of justice may require." Emphasis added.

The trial judge considered the evidence before the Commissioner and other evidence offered by petitioner; upon the record thus made, he reversed the Commissioner's order and reinstated Taylor's license and permit to operate a motor vehicle.

The question for us to decide is: Did the circuit court commit error when it reversed the Commissioner's order?

Summarized, the evidence upon which the Commissioner acted follows:

In Accomack county, State route 693 is hard-surfaced and extends in a northerly and southerly direction and is intersected at right angles by State route 702, which is likewise hard-surfaced. The accident happened on May 20, 1955, about 9:45 a.m. at the intersection of these roads. Petitioner was driving northwardly along route 693 at about fifty miles an hour, and his automobile collided in the intersection with a pick-up truck driven westwardly along route 702 by Emanuel Taylor. Both vehicles were severely damaged and Emanuel Taylor suffered injuries from which he died.

The speed limit on both roads in this area is fifty-five miles per hour, and there was no traffic control sign at the intersection for vehicles proceeding along route 702. Traffic on route 693 is, however, controlled at the intersection by a stop sign, and it is conceded that petitioner did not stop before entering the intersection. The area around the intersection is level and wooded, and the trees are intermingled with broom sedge and weeds described as being about four feet tall and growing near to the stop sign. Marks and debris on the highway showed that the vehicles collided about the center of the intersection and petitioner's automobile came to rest on the northwest corner and left skid marks about ninety feet in length. The pick-up truck came to rest on the east side of route 693 north of the intersection and left sixty nine feet of semi-circular skid marks behind it.

An abstract of conviction shows that petitioner pleaded guilty before the trial justice to the charge of careless and reckless driving and was fined $25.00 and costs. He, however, testified before the examiner and stated that he was not familiar with the intersection and

explained why he did not see the sign in time to stop or see the on-coming truck soon enough to avoid the collision. He said:

"A. * * * I came up on this intersection as I stated before, the sign was there to show, I saw it after the accident was over; I saw the sign, but as far as seeing the sign before I hit the crossing, I did not see it. Before I saw the sign I saw Mr. Taylor; at the time I should or might have been seeing the sign, I saw him and tried to avert him as much as I could and hit him at that time.

"Q. Do you know whether he saw you?

"A. He saw me at the moment we hit, he turned his head towards me. That's all I can say. Well, I was touching him, you might say, at that time.

\*　　\*　　\*　　\*　　\*　　\*　　\*

"A. They still haven't cut the weeds on the lane on which I was proceeding, still the old sign is still there. They put new signs up the other way to stop traffic all four ways now."

There was other testimony before the Commissioner which showed that petitioner was not familiar with the intersection and that the broom sedge on the shoulder, and the trees and bushes on the right side of the highway as one approached from the south tended not only to obscure the post and the lower edge of the stop sign, which was old and faded, but prevented one from readily observing the intersecting road or seeing a vehicle approaching from the east on route 702 until it was two or three car lengths from the intersection.

Additional evidence introduced before the circuit court consisted of pictures of the intersection and surrounding area and testimony of several witnesses concerning the condition, location and visibility of the stop sign and intersection to a driver approaching from the south on route 693. The pictures disclose that a thickly wooded area sur-rounds the level intersection, and the trees and bushes, intermingled with weeds and broom sedge, grow along the edge of the highway in rather close proximity to the sign. These witnesses described the broom sedge as reaching up to the lower edge of the stop sign and said that the post on which the sign is mounted is wholly obscured by the weeds and the sign is old, faded and discolored and not likely to attract a driver's attention.

T. Milton Byrd described the intersection and the visibility of the sign as follows:

"A. The woods on the east side and the west side run right up to the cross road. You don't see it. You break right out of the woods on either side, and there is the cross road.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

"Q. The weeds didn't reach the top of the sign, did they?
"A. No, sir, to the bottom of the sign.
"Q. So the top of the sign was visible?
"A. Yes, I would say so, if you were looking for it."

A. J. Gray testified to the conditions obtaining at the intersection thus:

"A. As I told you, I use that road quite a bit, and know the section, and I stop. I think I did run through it a few times when it was first put up, but that sign is not visible in time for a man driving fifty to fifty-five miles an hour. I don't think that sign is visible far enough away for that man to stop the car and keep it under reasonable control. The sign is very close to the intersection, and there is no warning at all until you get right on the sign. &ast; &ast; &ast; [A]nd there is quite a lot of broom sedge there in a direct line with the sign and they are approximately the same color. By the time a man saw the sign, it is too late to stop at a normal rate of fifty to fifty-five, and, because of the shadows, and the sun casting shadows on the road and the sign, it is very hard to see."

Frank Carter succinctly described the sign in this language:
"The sign is almost camouflaged."

James Wessells testified to the visibility of the sign as follows:
"Q. State whether or not it is visible to anyone not accustomed to this road?
"A. No, sir, I would say it isn't."

The location and condition of the sign, as well as the growth around it and the level wooded terrain surrounding the intersection all as described by the witnesses and as appearing in the pictures, lend credence to the belief that neither the sign nor a car approaching from the right on route 702 would be likely to attract the attention of a stranger approaching along route 693 from the south until he was in near proximity to the intersection.

In a brief oral opinion the trial judge observed that several witnesses "testified that the sign is so located, and the surrounding conditions were such, that you wouldn't be likely to take notice of it."

He also said that it was his opinion that had the case been contested and if the trial justice had heard all of the evidence—"the whole story"—as presented in the circuit court, "there would have been no conviction of reckless driving."

Upon the record before the Commissioner, thus supplemented by the additional evidence heard on appeal, which the trial judge evidently considered to be of considerable probative value, he concluded that Taylor's permit should not be suspended.

Petitioner contends that though the Commissioner may have been justified in suspending his permit on the record before him, yet as additional evidence of probative value was introduced before the circuit court, that court, in the exercise of the discretion conferred upon it by § 46-424 was fully warranted in restoring petitioner's permit. Attention is called to the fact that such action is expressly provided for by item (7) of paragraph (e), § 46-424, when additional evidence is introduced before the court.

Though additional evidence was introduced before the circuit court in the recent case of *Lamb* v. *Mozingo,* 198 Va. 432, 94 S. E. 2d 457, which is relied upon by the Commissioner, yet the facts there were materially different from those now before us. Mozingo's permit was suspended by the Commissioner, and upon appeal to the circuit court, the Commissioner's order was annulled and the permit restored, but upon appeal by the Commissioner to this court, we reinstated his order. The material distinction between that case and the one at hand is factual. There additional evidence was introduced before the court by both Mozingo and the Commissioner. Yet when all the evidence was considered, it not only disclosed that Mozingo had been convicted of four specific charges considered by the Commissioner but he had also been convicted of five violations of the motor vehicle act other than those introduced in evidence before the Commissioner. The preponderance of the evidence clearly sustained the findings of the Commissioner, and the numerous offenses of which Mozingo had been convicted convincingly proved that he was a potentially dangerous driver.

"In considering the reasonableness of the action of the Commissioner in revoking the appellant's Operator's license and registration privileges, it is important to bear in mind that such revocations are not intended as a punishment to the operator of the car, but are designed solely for the protection of the public in the use of the highways. * * * 'The authorities agree that the purpose of the revocation

is to protect the public and not to punish the licensee.' " *Butler* v. *Commonwealth*, 189 Va. 411, 423, 53 S. E. 2d 152.

"The purpose of the statute is to deny the use of the highways to persons who are shown to have been so reckless in their customary operation of motor vehicles that a repetition of the same, or similar conduct, may be expected, and if it occurs, it will constitute a menace to the safety of others. * * * But it was intended to apply only to drivers who are, in fact, unsafe, and this fact the statute contemplates must be proved by clear and reliable evidence at a fair trial." *Willis* v. *Commonwealth*, 190 Va. 294, 301, 56 S. E. 2d 222.

Here petitioner has been convicted of but one offense. Though he pleaded guilty to the charge of careless and reckless driving, yet the additional evidence before the circuit court tended to explain more definitely why he failed to heed the stop sign. In the opinion of the trial judge the evidence before him upon a plea of not guilty would have been sufficient to justify an acquittal of that offense. Upon the entire record it does not appear that the court abused the discretion vested in it by § 46-424 when it reversed the order of suspension and restored petitioner's permit and license.

*Affirmed.*